IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| PHIBRO BIODIGESTER, LLC,<br><br>Plaintiff,<br><br>v.<br><br>MURPHY-BROWN, LLC,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Case No. 4:22-cv-00050-RJS-PK<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Paul D. Kohler |

Plaintiff Phibro Biodigester, LLC (Phibro) owns and operates an anaerobic digester facility in Beaver County, Utah (Phibro Facility). The Phibro Facility obtains pig manure exclusively from Defendant Murphy-Brown, LLC (Murphy-Brown) which Phibro processes to produce methane used for electricity generation.[1] Recently, Murphy-Brown began closing down operations of the Murphy-Brown pig barns that supple manure to Phibro.[2] Facing a manure supply shutdown, Phibro filed a Motion for Preliminary Injunction seeking to enjoin Murphy-Brown from ceasing operations.[3] For the reasons explained below, the court denies Phibro's Motion.

## BACKGROUND

Murphy-Brown is a livestock producer that raises pigs for market.[4] It owns the Blue Mountain, Skyline, and Skyline West farm complexes (BMS Farms) in Beaver County and Iron

---

[1] Dkt. 51 ¶¶ 2-3, 5 (Amended Complaint).

[2] *Id*. ¶¶ 5-8.

[3] Dkt. 58 (Motion for Preliminary Injunction and Memorandum in Support) (Inj. Mot.).

[4] Dkt. 26-1 ¶ 4 (Declaration of James W. Webb).

County, Utah.[5]  Murphy-Brown is permitted to have roughly 450,000 'finisher' pigs at the BMS Farms finisher barns.[6]  Phibro uses manure from some of the BMS Farms finisher barns to operate an anaerobic digester facility, producing methane gas for electricity production.[7]

The parties' manure supply relationship is governed by the Amended and Restated Manure Supply Agreement (ARMSA).[8]  The ARMSA was signed in July 2013 by Murphy-Brown and Phibro's predecessor-in-interest, BM Biogas.[9]  In 2016, BM Biogas defaulted on its obligations under a financing agreement and a receiver was appointed over its assets, including its rights under the ARMSA.[10]  Phibro ultimately paid $875,000 for BM Biogas's assets in a receivership sale.[11]  Those assets, including the rights held under the ARMSA, were then assigned to Phibro in February 2019.[12]

The ARMSA provides that Murphy-Brown will sell Phibro manure for use at the Phibro Facility in exchange for a royalty.[13]  Manure is defined in the ARMSA as specifically referring to manure from the hogs at the BMS Farms finisher barns that were part of the defined Production Pods at the time the ARMSA was entered (ARMSA Finisher Barns).[14]  Phibro has no

---

[5] Dkt. 26-1 ¶ 5 (Webb Decl.).

[6] Dkt. 26-1 ¶ 13 (Webb Decl.); Dkt. 58-2 at 140:4-12 (Deposition of James W. Webb taken September 27, 2022) (hereinafter Webb Depo.).

[7] Dkt. 26-1 ¶¶ 27 (Webb Decl.); Dkt. 34 ¶¶ 19-21 (Supplemental Rebuttal Declaration of Simon Greenshields) (hereinafter Greenshields Supp. Decl.).

[8] Dkt. 26-1 ¶¶ 18, 23, 27 (Webb Decl.); Dkt. 4-1 (ARMSA).

[9] Dkt. 4-1 (ARMSA); Dkt. 26-1 ¶ 18 (Webb Decl.).

[10] Dkt. 4 ¶¶ 26-28 (Declaration of Simon Greenshields) (hereinafter Greenshields Decl.).

[11] Dkt. 4 ¶¶ 33-34 (Greenshields Decl.).

[12] Dkt. 4 ¶¶ 33-38 (Greenshields Decl.); Dkt. 75-2 (Assignment and Assumption Agreement).

[13] Dkt. 4-1 §§ 2.1, 8 (ARMSA).

[14] Dkt. 4-1 § 1 (ARMSA) (Manure under the ARMSA includes "all manure from finishing operations from the hogs located at the Production Pods."  Production Pods are defined as the "Skyline West Production Pod, the Skyline Production Pod, and the Blue Mountain Production Pod." Each of the Production Pods is defined as the "existing finisher barns" in each respective farm complex as of the date the ARMSA was entered.).

right to manure from other BMS Farms barns that are not part of the ARMSA Finisher Barns, such as the nursery, sow, or boar barns.  Consistent with the ARMSA and related land lease agreements, the Phibro Facility is on Murphy-Brown property near the BMS Farms.[15]

The ARMSA provides for an initial term of ten years starting January 1, 2013 with two subsequent five year automatic renewal periods.[16]  The ARMSA also includes provisions requiring Murphy-Brown to maintain certain finisher hog population levels at the ARMSA Finisher Barns, notice requirements related to material operational changes, a provision for early termination of the ARMSA, royalty payment guidelines, dispute resolution procedures, and a limitation of liability clause.[17]

Phibro spent roughly two million dollars obtaining BM Biogas's rights under the ARMSA and as an initial capital investment repairing the Phibro Facility to make it operational after a lengthy period of inattention.[18]  Since gaining rights under the ARMSA, taking over the Phibro Facility, and getting the Phibro Facility operational, Phibro has taken the manure it required to operate from Murphy-Brown consistent with the ARMSA.[19]  To date, Phibro has been unable to match the previous productivity of BM Biogas at the Phibro Facility.[20]

In June 2022, Murphy-Brown announced that due to the rising costs of doing business in California, it was shutting down a meat processing plant in Vernon, California (Vernon Plant).[21]

---

[15] Dkt. 4 ¶¶ 9, 12, 16 (Greenshields Decl.).

[16] Dkt. 4-1 § 3.1.1 (ARMSA).

[17] Dkt. 4-1 §§ 3.2, 4.3, 8, 13.3, 13.4 (ARMSA).

[18] Dkt. 4 ¶ 41 (Greenshields Decl.) ("Between its bid at auction and the money it has invested, therefore, Phibro spent more than $1,900,000 on the Facilities and associated operations").

[19] Dkt. 34 ¶ 4 (Greenshields Supp. Decl.).

[20] Dkt. 75-1 ¶¶ 7, 11 (Greenshields Third Decl.); Dkt. 75-1 at 9 (August 4, 2021 Email from Simon Greenshields to Kraig Westerbeek noting that current Phibro production is 16MW compared to BM Biogas's production being around 30MW).

[21] Dkt. 26-1 ¶ 54 (Webb Decl.); Dkt. 58-2 at 99:23-100:19 (Webb Depo.).

Nearly all of the finisher pigs sent to market from the BMS Farms operations go to the Vernon Plant for processing.[22]  Due primarily to the Vernon Plant closure, Murphy-Brown decided to close the BMS Farms finisher barns.[23]

Later in June 2022, Murphy-Brown announced to farmers at the BMS Farms its plans to depopulate the BMS Farms finisher barns starting in October 2022 and ending in February 2023.[24]  As part of its plans to cease operations of the BMS Farms finisher barns, Murphy-Brown also stopped inseminating sows at BMS Farms around June 2022.[25]  In July 2022, Murphy-Brown sent letters to farmers working at the BMS Farms finisher barns informing the farmers that new pigs would not be sent to the barns once current populations were sent to market.[26]  The letters also offered the farmers additional payments in exchange for cooperating with the farm closures.[27]

Approximately 450 employees work for Murphy-Brown in Milford, Utah.[28] With the upcoming BMS Farms finisher barn closures, Murphy-Brown will be reducing the number of Utah employees.[29]  Murphy-Brown has offered all of the Murphy-Brown employees losing jobs due to the BMS Farms closures jobs at other Murphy-Brown facilities.[30]  A majority of the offers

---

[22] Dkt. 26-1 ¶ 55 (Webb Decl.).

[23] *Id.* at ¶ 55-57 (Webb Decl.).

[24] Dkt. 4 ¶ 42 (Greenshields Decl.).

[25] Dkt. 58-2 at 25:1-12 (Webb Depo.).

[26] Dkts. 5-1, 5-2.

[27] Dkts. 5-1, 5-2.

[28] Dkt. 58-2 at 178:23-25 (Webb Depo.).

[29] *Id.* at 179:1-8.

[30] *Id.*

for new Murphy-Brown jobs have been accepted, even though some of the new jobs are located outside of Utah.[31]

After the closure announcements, Phibro sought information and assurances from Murphy-Brown concerning the BMS Farms finisher barns depopulation.[32]  Not receiving the information it sought, Phibro filed suit against Murphy-Brown August 8, 2022 seeking injunctive relief based on Murphy Brown's alleged breaches of the ARMSA by depopulating the finisher barns.  On August 22, 2022, Murphy-Brown sent Phibro a letter noting the pending closure of the finishing barns at BMS Farms and purportedly terminating the ARMSA and related land leases.[33]

## PROCEDURAL HISTORY

Upon filing suit on August 8, 2022, Phibro concurrently filed a Motion for Temporary Restraining Order and/or Preliminary Injunction seeking an order directing Murphy-Brown to continue to perform under the ARMSA and to reverse its plan to close the BMS Farms finisher barns.[34]  Phibro's TRO Motion relied heavily on its contention that because the ARMSA is a requirements contract, specific performance is an available remedy under the Utah Uniform Commercial Code.[35]

After full briefing, a hearing was held on Phibro's TRO Motion on August 26, 2022 and August 29, 2022.[36]  This court denied the TRO Motion by oral ruling August 29, 2022.[37]  The

---

[31] *Id.* at 179:1-20.

[32] Dkt. 4 ¶¶ 44-49 (Greenshields Decl.).

[33] Dkt. 34-5 (Letter dated August 22, 2022 from Jim Webb to Simon Greenshields) (hereinafter Termination Letter).

[34] Dkt. 3 (TRO Motion).

[35] Dkt. 3 at 19, 23-24 (TRO Motion).

[36] Dkts. 42, 48.

[37] Dkt. 48.

court's denial acknowledged Phibro appeared to make a sufficient showing it was likely to succeed on at least some of its contract claims, but found Phibro did not: (1) provide sufficient evidence to demonstrate the balance of harms tilted in its favor; or (2) demonstrate it would be irreparably harmed if injunctive relief was not issued in given the totality of the circumstances of the relationship created by the ARMSA.[38]  The relevant circumstances the court identified included the limited term of the ARMSA, the operation of the limitation of liability provision in the ARMSA, the parties' sophistication, and the suitability of the relationship for establishing and calculating economic harms caused by any breach.[39]  The court emphasized that the ruling was preliminary, based on a limited record before the parties had conducted any discovery, and did not establish the law of the case moving forward.[40]

The parties then conducted expedited discovery in anticipation of forthcoming preliminary injunction proceedings.[41]  On September 13, 2022, Phibro filed an Amended Complaint again seeking equitable relief enjoining Murphy-Brown from depopulating the ARMSA Finisher Barns.[42]  The Amended Complaint largely reasserts the allegations in Phibro's initial Complaint, but includes additional breaches of the ARMSA including the alleged failure to give notice of material changes to operations, an improper attempt to terminate the ARMSA, and improper depopulation of the ARMSA Finisher Barns.[43]  The Amended Complaint also newly alleges breaches of the land leases related to the ARMSA.[44]

---

[38] Transcript of August 29, 2022 hearing before Judge Robert J. Shelby on Phibro's Motion for TRO at 153:15-18;166:15-17; 171:19-176:3.

[39] *Id.* at 171:19-176:3.

[40] *Id.* at 153:19-154:8.

[41] Dkt. 49.

[42] Dkt. 51 (Amended Complaint).

[43] *Id.*

[44] *Id.*

Phibro filed its Motion for Preliminary Injunction on September 30, 2022.[45]  In it, Phibro renews its request that the court order Murphy-Brown to perform under the ARMSA and to reverse its plans to close the BMS Farms finisher barns.[46]  After full briefing, a hearing on Phibro's Motion was held October 17, 2022.[47]

## LEGAL STANDARD

A party seeking preliminary injunctive relief must demonstrate four elements: "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect public interest."[48]  Because a "preliminary injunction is an extraordinary remedy," the grant of such relief is "the exception rather than the rule."[49] To prevail, the "movant's right to relief must be clear and unequivocal."[50]

Certain injunctions are disfavored and require a greater showing from the movant.[51] If the injunctive relief requested: (1) "mandates action" rather than prohibits action, (2) "changes the status quo," or (3) "grants all the relief that the moving party could expect from a trial win" then

---

[45] Dkt. 58 (Inj. Mot.).

[46] Dkt. 58 (Inj. Mot.).

[47] Dkt. 86.  After the hearing, supplemental briefing and objections were filed.  Dkts. 88, 90, 94.  The court finds the post-hearing briefing procedurally improper.  In any event, the supplemental briefing asserts arguments related to the likelihood of success on the merits, which the court does not address in this Order. *See* dkt. 88.

[48] *Valdez v. Grisham*, No. 21-2105, 2022 WL 2129071, at *3 (10th Cir. June 14, 2022) (quoting *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (internal quotation marks omitted)).

[49] *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (quoting *Free the Nipple–Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019) (internal quotations omitted)).

[50] *Dine Citizens Against Ruining Our Env't*, 839 F.3d at 1281 (quoting *Wilderness Workshop v. BLM*, 531 F.3d 1220, 1224 (10th Cir. 2008)).

[51] *Mrs. Fields Franchising, LLC*, 941 F.3d at 1232.

the movant faces a higher burden.[52]  So-called "mandatory" injunctions are also disfavored.  An injunction is "mandatory if the requested relief affirmatively requires the nonmovant to act in a particular way, and as a result places the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction."[53]  An injunction that would force a party's continued participation in a business venture and require ongoing cooperation with a litigation opponent is a disfavored, mandatory injunction that would "undoubtedly" require ongoing court supervision.[54]  A movant seeking a disfavored injunction must make a "strong showing" on the "likelihood-of-success-on-the-merits and the balance-of-harms factors."[55]

Phibro's requested injunction is a disfavored mandatory injunction.  Phibro seeks an order requiring Murphy-Brown to "maintain a population of no fewer than 405,000 hogs at the BMS Finisher Barns."[56]  On its face, Phibro's requested relief seeks an order of mandatory action: "maintain[ing] a population of . . . hogs."  While Phibro argues that the requested injunction merely maintains the status quo,[57] injunctions do not automatically avoid heightened scrutiny "merely because they preserve the status quo."[58]  Regardless of how the status quo is impacted, Phibro seeks an order that would require mandatory action which constitutes a disfavored injunction.

---

[52] *Id.*

[53] *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1261 (10th Cir. 2005) (cleaned up).

[54] *UHSpro, LLC v. Secure Documents, Inc.*, No. 2:17-CV-00411-JNP, 2017 WL 2729082, at *3-4 (D. Utah June 23, 2017).

[55] *Mrs. Fields Franchising, LLC*, 941 F.3d at 1232.

[56] Dkt. 58 at 43 (Inj. Mot.).

[57] *Id.* at 24.

[58] *Schrier*, 427 F.3d at 1260.

Phibro's argument that its request for relief prohibiting depopulation does not require Murphy-Brown to do anything fails.[59]  Couched as a double negative, Phibro's argument ignores the reality of actions that would be required to maintain a population of finisher pigs.  An injunction granting Phibro's requested relief would necessarily mandate Murphy-Brown take affirmative actions including starting inseminating sows to replenish the finisher barns once the current pigs are sent to market, rescinding or modifying job offers to employees impacted by the pending closures, and rescinding termination letters or negotiating new contracts with farmers to raise pigs at the finisher barns, among other actions.  Additionally, it would require Murphy-Brown to operate a segment of its business it is attempting to close for business reasons and would require Murphy-Brown to cooperate with a litigation opponent.

Additionally, it is easy to forecast a myriad of situations where this court would be required to supervise Murphy-Brown's compliance with an injunction, including related to insemination, pig population levels and replenishment, and manure delivery and return.[60]  Therefore, to obtain the disfavored injunctive relief it seeks, Phibro faces a heightened burden and must make a "strong showing" that the "likelihood-of-success-on-the-merits and the balance-of-harms factors" tilt in its favor.[61]

---

[59] Dkt. 58 at 24 (Inj. Mot.).

[60] As an example of issues that may arise and require court supervision of an issued injunction, in the short time since the filing of the Amended Complaint, Phibro now alleges in their Motion an additional breach of the ARMSA based on an allegation that "[i]n the last couple of weeks, [Murphy-Brown] has stopped accepting manure at certain lagoons" at the BMS Farms.  Dkt. 58 at 31 (Inj. Mot).  Conversely, Murphy-Brown alleges issues have arisen related to Phibro not taking manure from 40,000 finisher pigs at several of the BMS Farms due to Phibro employment issues.  Dkt. 67 ¶ 63 (Opposition to Motion for Preliminary Injunction) (hereinafter Opp'n).  Given that both parties raise new issues related to performance under the ARMSA, it appears the court would be required to actively supervise any injunction issued.

[61] *Mrs. Fields Franchising, LLC*, 941 F.3d 1221 at 1232.

## ANALYSIS

Phibro may obtain a preliminary injunction only if "monetary or other traditional legal remedies are inadequate, and the right to relief is clear and unequivocal."[62]  Preliminary injunctions are "drastic remedies" and movants must clearly carry the "burden of persuasion."[63]  Because "a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction,"[64] this factor is addressed first.  The court then analyzes the balance of harms factor where Phibro must make a "strong showing."

## I. PHIBRO FAILS TO DEMONSTRATE IRREPARABLE HARM

A party seeking injunctive relief must "demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages.[65]  "Determining whether irreparable harm exists can be a difficult and close question" because irreparable harm can be challenging to define.[66]  However, "economic loss suffered by a business entity usually does not, in and of itself, constitute irreparable harm."[67]  Moreover, establishing irreparable harm is not "an easy burden" to meet.[68]  The injury forming a basis for the injunction must be "certain and great," not "merely serious or substantial."[69]  Supposition will not suffice—the movant must

---

[62] *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (cleaned up).

[63] *UHSpro, LLC*, 2017 WL 2729082 at *3.

[64] *First W. Cap. Mgmt. Co.*, 874 F.3d at 1141.

[65] *Id.*

[66] *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262 (10th Cir. 2004) (internal citations and quotation marks omitted).

[67] *UHSpro, LLC*, 2017 WL 2729082 at *6 (quoting *Port City Properties v. Union Pac. R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008)).

[68] *Dominion Video Satellite, Inc.*, 356 F.3d at 1262 (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)).

[69] *Id.* at 1262-63 (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (internal citation and quotations omitted)).

submit "sufficient evidence of irreparable harm."[70]  Phibro fails to meet its burden of demonstrating irreparable harm will occur without injunctive relief because the totality of the circumstances surrounding the manure-supply relationship do not support a finding of irreparable harm and because Phibro has failed to provide sufficient argument or evidence to the contrary.

### A.        The Totality of Circumstances Weighs Against Finding Irreparable Harm

Phibro fails to establish irreparable harm because the circumstances and characteristics of the relationship that Phibro and Murphy-Brown bargained for are especially well-suited to compensation with money damages.  For starters, Phibro's Motion rests entirely on alleged breaches of the ARMSA by Murphy-Brown.[71]  While Phibro tries to use the UCC to point the remedy for breach towards specific performance,[72] the classic remedy for a breach of contract is money damages.[73] Additionally, the ARMSA has a finite term; the relevant industries are commoditized; the parties drafting the ARMSA were sophisticated and deliberate in creating provisions like the limitation of liability; and the relationship has a limited scope, historical royalty payments, and performance data that can be used for calculating economic damages.

Other courts may reach opposite outcomes in somewhat similar cases where some of these characteristics are absent.  However, in light of the totality of the facts and circumstances at issue here, Phibro cannot show it will be irreparably harmed without injunctive relief.

---

[70] *K-TEC, Inc. v. Vita-Mix Corp.*, No. 2:06-CV-108 TC, 2008 WL 11518866, at *3 (D. Utah Mar. 19, 2008).

[71] Dkt. 58 at 26-31 (Inj. Mot.).

[72] *Id.* at 31-35.

[73] *Kearl v. Rausser*, No. 2:04CV00175 BSJ, 2007 WL 626356, at *2 (D. Utah Feb. 23, 2007).

1. The Finite Life of the ARMSA Weakens Phibro's Claim of Irreparable Harm.

The ARMSA-created relationship is limited to no more than twenty years and is already roughly halfway complete.[74]  This substantially undercuts Phibro's argument for irreparable harm based on injury to business reputation or the loss of goodwill.  In some contexts, damage to a business reputation will sustain injunctive relief.  However, the fixed term here uniquely focuses the parties on maximizing the economic returns of the relationship over the short-term of the relationship, not on building a long-term reputation or brand.  This reality is supported by the fact that Phibro has done virtually no "marketing, advertising, or promotion" of its brand or facility.[75]  This is not to say that Phibro would not face "substantial" reputational harms or the loss of goodwill if it can no longer access Murphy-Brown manure—but the bar to demonstrate irreparable harm is high and the potential loss of reputation and goodwill here are not sufficiently "certain and great."[76]

2. Phibro's Sales into a Commoditized Energy Market Undercuts Its Claim of Irreparable Harm.

The ARMSA is a manure supply contract where the manure is processed and used as fuel to generate electricity and associated renewable energy credits.[77]  Energy production and renewable credits are both commoditized markets where brand reputation is less critical.  Phibro does not provide unique electricity or special energy credits.  These are fungible.  Provided Phibro has electricity and energy credits to sell, Phibro's reputation and goodwill are less

---

[74] Dkt. 4-1 § 3.1.1 (ARMSA).

[75] Dkt. 69-3 at 143 (Phibro Profit and Loss Statement attached as Exhibit 29 to Greenshields Depo.) (hereinafter Phibro P&L); *see also* Dkt. 67-7 at 14 (Phibro Response to Interrogatory No. 7).

[76] *Dominion Video Satellite, Inc.*, 356 F.3d at 1262-63 (quoting *Prairie Band of Potawatomi Indians*, 253 F.3d at 1250 (internal citation and quotations omitted)).

[77] Dkt. 4-1 § 2 (ARMSA).

critically important for operations than in other industries without fungible, commoditized products.

This is evidenced by Phibro having customers such as Tenaska Power Services that are not end customers, but are actually buying the energy from Phibro and then selling it on into California markets in exchange for a royalty.[78]  Again, this does not mean Phibro's reputation and goodwill would not be damaged without injunctive relief or that they play no role in Phibro's ability to operate, but it illustrates that the potential reputational harm and loss of goodwill does not rise to the level required to establish irreparable harm.

3.  The ARMSA's Specific Terms and Deliberate Limitations Weighs Against Finding Irreparable Harm.

The parties to the ARMSA were sophisticated, understood the circumstances of the transaction, and deliberately defined the boundaries of the relationship in the ARMSA. This is demonstrated by the ARMSA's express limitation of liability provision, the early termination provision, and the lack of any provision acknowledging irreparable harm or mandating specific performance in the event of breach.

The ARMSA contemplated Phibro's predecessor-in-interest would be making significant capital investment for improvements on Murphy-Brown's property, including that the Phibro Facility would be essentially landlocked and dependent on a supply of manure from Murphy-Brown.[79]  Despite this, the parties significantly limited the potential liability either party could

---

[78] Dkt. 69-3 (Greenshields Depo. at 116:20-121:23); Dkt. 34 ¶ 27 (Greenshields Supp. Decl.).

[79] Dkt. 4-1 § 5 (ARMSA) (outlining forthcoming construction by Phibro's predecessor); *id.* § 3.2 (ARMSA) (providing Murphy-Brown does not have the usual termination rights when Phibro stops operating generating facility if Phibro's stoppage is to make capital improvements).

face for breaching the ARMSA and specifically excluded any liability related to the cost of capital for breach or nonperformance of the ARMSA.[80]

Additionally, while the parties included specific limitations on liability, they did not include an express right to specific performance and did not acknowledge irreparable harm would occur in the event of a breach of the ARMSA.[81]  Phibro argues this oversight is deliberate because the parties drafting the ARMSA relied on general Utah Uniform Commercial Code (UCC) principles governing the ARMSA.[82]  For purposes of this Order, the court assumes that the ARMSA is a requirements contract, that manure is a unique good governed by the UCC, and that the parties drafting the ARMSA were aware of the background legal landscape associated with the UCC.

The UCC, however, does not mandate or create a presumption of specific performance for requirements contracts or unique goods.[83]  Instead, it merely permits specific performance where goods are unique or in other proper circumstances.[84]  Obtaining injunctive relief requires a showing that the right to relief is "clear and unequivocal."[85]  That the UCC permits specific performance in some circumstances does not meet this burden.

Further, while the UCC provides a general framework, parties in Utah are still free to contract around nearly all provisions of the UCC[86] and are specifically permitted to limit liability

---

[80] Dkt. 4-1 § 13.4 (ARMSA).

[81] *See generally* Dkt. 4-1 (ARMSA).

[82] Dkt. 58 at 37-44 (Inj. Mot.).

[83] Utah Code Ann. § 70A-2-716.

[84] *Id.* ("Specific performance **may** be decreed . . . ." (emphasis added)).

[85] *Dine Citizens Against Ruining Our Env't*, 839 F.3d at 1281 (internal citation omitted).

[86] Utah Code Ann. § 70A-1a-302.

by arms-length bargain.[87] Acceptable limitations of liability under the UCC include exclusion of consequential damages, as was done here,[88] or by providing "for remedies in addition to *or in substitution* for those provided" under the UCC.[89] Specifically, the UCC provides, as an example, that damages could be limited "to return of the goods and repayment of the price."[90] Therefore, expressly under the provisions of the UCC, a party requiring a rare and unique good in order for its business to survive may, by bargain in a contract, agree to be limited only to the return of the good and repayment of price in the event unsuitable goods are sent.

Here, the parties to the ARMSA created specific liability provisions and limitations. Notably, even though the ARMSA limits significant liabilities, it specifically provides that some forms of liability are not included in the limitation of liability provision. Under Section 12.4, Phibro must indemnify Murphy-Brown for liability flowing from claims or losses arising out of Phibro's negligence or failure to adhere to Murphy-Brown's bio-security rules, including the loss of Murphy-Brown's hogs or reasonable attorney's fees.[91] Under the limitation of liability provision of the ARMSA, the parties agree that Phibro's liabilities arising out of Section 12.1 "are not the type of damages restricted by the provisions of [this provision]."[92] That the ARMSA specifically limits liability but also includes carve outs is significant. The ARMSA, however, does not make reference to specific performance or irreparable harm, which undercuts Phibro's ability to clearly show it has a right to injunctive relief.

---

[87] Utah Code Ann. § 70A-2-719.

[88] *Id.*

[89] *Id.* (emphasis added).

[90] *Id.*

[91] Dkt. 4-1 § 12.4 (ARMSA).

[92] *Id.* § 13.4.

The ARMSA also contemplated circumstances where the parties could terminate the agreement without liability, including if Murphy-Brown discontinued operations of the Circle Four Farms, which encompasses the BMS Farms finisher barns.[93]  The parties offer different interpretations of the scope of Murphy-Brown operations included in "Circle Four Farms" as defined in the ARMSA.[94]  Murphy-Brown offers that Circle Four Farms encompasses only the ARMSA Finisher Barns, while Phibro asserts it includes other farms such as the sow farm, nursery, and boar farms.[95]

Regardless of how Circle Four Farms is defined -- and the court does not reach this issue -- Murphy-Brown is shutting down all of the ARMSA Finisher Barns that Phibro has any right to receive manure from under the ARMSA.[96]  And regardless of which party's interpretation of Circle Four Farms is used, it is indisputable that shuttering all of Murphy-Brown's pig barns in Beaver and Iron County is the most that was required to terminate the ARMSA without any liability to Phibro.[97]  At any point, Murphy-Brown could decide to close Circle Four Farms, limited at most to only two counties in Utah -- even if Murphy-Brown did not adjust operations anyplace else nationally -- and face no liability.  Whether Murphy-Brown is validly terminating the ARMSA is not decided by this Order.  However, the deliberate drafting of the ARMSA to allow termination without any liability if Murphy-Brown decided to close Circle Four Farms, however defined, weighs against a finding of irreparable harm here now.[98]

---

[93] Dkt. 4-1 § 3.2 (ARMSA).

[94] *Compare* Dkt. 58 at 1-2 (Inj. Mot.) *with* Dkt. 67 ¶ 37 (Opp'n).

[95] *Id.*

[96] Dkt. 4-1 § 1 (ARMSA).

[97] *Id.* at § 1 (ARMSA) (limiting Circle Four Farms to Beaver and Iron County Utah); *id.* at § 3.2.

[98] Phibro alleges Murphy-Brown owns roughly 725,000 hogs in Utah, with 450,000 hogs at BMS Farms.  Dkt. 58 at 5.  That Murphy-Brown is eliminating the operations related to the 450,000 hogs at BMS Farms means even under the broader interpretation of Circle Four Farms advanced by Phibro, Murphy-Brown's attempted termination is substantially similar to the maximum that could possibly be required under the ARMSA. A valid termination under

Moreover, even where contracts are governed by the UCC for unique goods or requirements, courts still often look at whether other traditional forms of irreparable harm exist, such as whether the party would be able to meet its contractual obligations to other parties,[99] whether there would be "destruction of its reputation,"[100] or damage to goodwill in a small industry where "relationships and reputation are paramount."[101]  Requiring more than a particular contract type or term to find irreparable harm is consistent with the Supreme Court's warning against establishing broad, categorical conclusions in injunction cases.[102]  Similarly in the Tenth Circuit, in cases where irreparable harm is alleged based on breach of an exclusivity clause, courts still look to traditional markers of irreparable harm as part of the analysis.  As explained more fully below, Phibro fails to demonstrate irreparable harm under traditional tests.  Viewed in total, the structure and terms of the ARMSA weigh against a finding of irreparable harm.

4.  <u>A Finding of Irreparable Harm is Undercut Because the Relationship Created by the ARMSA is Especially Well-Suited to Calculating Monetary Damages.</u>

The relationship between Phibro and Murphy-Brown under the ARMSA readily lends itself to the calculation of monetary damages.  First, there is substantial historical performance under the ARMSA that can be used to determine what monetary damages may be appropriate.  This includes information about past amounts of manure taken, regular royalty calculations, and

---

the ARMSA may still require much more than what Murphy-Brown is doing, but it is demonstrative of the intention of the parties regarding potential liabilities in the event Murphy-Brown decided to discontinue operations.  This is not dispositive of the issue of irreparable harm, but it is a factor demonstrating the intention of the parties drafting the ARMSA that aids in evaluating the totality of the circumstances here.

[99] *MAG Aerospace Indus., LLC v. Precise Aerospace Mfg., Inc.*, No. 5:18-CV-01096-RGK-JC, 2018 WL 6074596, at *3 (C.D. Cal. July 18, 2018).

[100] *JD Norman Indus., Inc. v. Metaldyne, LLC*, No. 15-13863, 2016 WL 1637561, at *8 (E.D. Mich. Apr. 26, 2016).

[101] *Bionpharma Inc. v. CoreRx, Inc.*, 582 F. Supp. 3d 167, 175 (S.D.N.Y. 2022).

[102] *eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 392-94 (2006).

energy generation.  Additionally, the energy market is a commodity sector where forecasting is ordinary and future performance under the ARMSA is limited to a finite term.  Taken together, the ability to forecast future performance or to calculate monetary damages here is reasonable and appropriate.  As evidence of this, Phibro sufficiently trusted past performance to create future projections through 2033 that Phibro represented were sufficiently reliable to use during purchase negotiations last year.[103]

Viewed as a whole, the relationship between Murphy-Brown and Phibro under the ARMSA and the circumstances at issue here weigh against a finding of irreparable harm.

## B.      Phibro's Argument and Sparse Evidence Do Not Establish Irreparable Harm

Phibro essentially asks the court to find irreparable harm is *per se* established under certain circumstances present here.  Phibro attempts to establish irreparable harm will occur absent an injunction because: (1) monetary damages are inadequate given the ARMSA is a requirements contract and Phibro cannot cover,[104] (2) Phibro will suffer loss of reputation and goodwill,[105] (3) there is a limitation of liability provision,[106] (4) Phibro will be forced out of business,[107] and (5) damages are too difficult to calculate.[108]  Phibro's arguments and sparse evidence do not establish a clear and unequivocal right to relief.

---

[103] Dkt. 75-1 at 13 (12 Year Cash Flow Model Valuation Scenarios).

[104] Dkt. 58 at 31-34 (Mot. Inj.).

[105] *Id.* at 35.

[106] *Id.* at 41-42.

[107] *Id.* at 41.

[108] *Id.* at 38.

1. <u>There is No Per Se Presumption that Irreparable Harm Exists for Breaches of Contracts with Unique Goods.</u>

Phibro spends significant time articulating why the manure at issue is a unique good based on the ARMSA being a requirements contract and Phibro's inability to cover.  As the court explained above, for purposes of this Order the court assumes the ARMSA is a requirements contract, that manure is a unique good, and that Phibro cannot cover.  However, Phibro does little to explain why that clearly demonstrates irreparable harm.  Citing two non-controlling cases it argues "damages are often inadequate when the subject of as agreement is unique" based on the contract being a requirements contract or the inability to cover.[109]  Phibro provides no guidance concerning when damages are found to be inadequate or the circumstances delineating where they are found to be adequate or inadequate.

What Phibro seems to seek is a bright-line rule recognizing irreparable harm exists and warrants injunctive relief in all requirements cases or all cases where goods cannot be covered. But Phibro fails to establish that is the law.  And as explained above, the UCC does not create an automatic right to specific performance.  Rather, courts evaluating requirements contracts or unique goods still look to other traditional forms of irreparable harm and avoid creating categorical bases for injunctive relief.

In passing, Phibro offers conclusory statements that it has shown traditional forms injury that, when combined with the ARMSA being a requirements contract or manure being a unique good, establish irreparable harm.[110]  Phibro concludes without pointing to any evidence that it will lose its competitive place in the marketplace, will be forced to close its doors, and that damages will be hard to calculate.  As explained in more detail below, Phibro fails to meet its

---

[109] *Id.* at 31.

[110] Dkt. 72 at 26-27 (Reply).

burden on each conclusion because it has not provided sufficient evidence of these harms.
Phibro, therefore, can only meet its burden to show irreparable harm if the court concludes the
breach of a requirements contract or a contract for a unique good is *per se* evidence of
irreparable harm. Because the court declines to do so, Phibro fails to meet its burden to
demonstrate irreparable harm.

2. Phibro Provides No Evidence of Harm to Reputation or Goodwill.

A party must provide actual evidence of damage to reputation or goodwill to show
irreparable harm.[111] Phibro fails to provide any such evidence. In its briefing, Phibro identifies
no contracts it must fulfill, no customers reliant upon it, and no reputation that it has to lose. To
the contrary, Murphy-Brown points out that Phibro does not enjoy a reputation in the biogas
industry, except that it has a problematic reputation related to a history of poor performance.[112]
Phibro's conclusion that its reputation will be harmed if it does not generate electricity is not
sufficient.[113] And even if the court were to consider the mention of three customers that Phibro
includes in a declaration,[114] the only contracts Phibro produced connected to these customers do
not list Phibro as a party to the contracts or the owner or operator of the biodigester facility.[115]

Additionally, the term of the ARMSA is finite, which reduces the severity of any
reputational harm argument. Whatever reputation Phibro could develop does not carry beyond
the term of the ARMSA for purposes of evaluating irreparable harm. Given the lack of evidence

---

[111] *Schrier*, 427 F.3d at 1267.

[112] Dkt. 69-3 at 68 (May 21, 2019 Springville City Staff Report noting that the relationship with Phibro and its predecessor, there were frequent plant outages without production, equipment failures, and underperformed projections.).

[113] Dkt. 58 at 35 (Inj. Mot.).

[114] Dkt. 34 ¶ 27 (mentioning California System Operator, Tenaska Power Services, and Three Degrees).

[115] Dkt. 69-3 at 105-106 (Environmental Attribute Purchase Agreement between Phibro Americas, LLC and Degrees3 Transportation Solutions, LLC with a term through December 31, 2023.); Dkt 69-3 at 131 (Master Power Purchase and Sale Agreement between Tenaska Power Services Co. and Phibro Americas LLC).

regarding Phibro's customers and reputation, and in view of counter-evidence that Phibro already has reputational shortcomings, Phibro has failed to sufficiently demonstrate irreparable harm based on loss of reputation.

### 3. A Limitation of Liability Provision Does Not Create Presumptive Irreparable Harm.

A limitation of liability clause does not automatically create a presumption that irreparable harm exists.  Both parties have offered non-controlling caselaw in which courts reached opposite views on the impact of a limitation of liability provision.  Phibro's cited case[116] holds that a limitation of liability might justify injunctive relief because the limitation could jeopardize relief on the merits.[117]  In contrast, Murphy-Brown offers cases focusing on the inherent inequity of allowing a party to bargain away rights to damages at arms-length and then to use that limitation as a sword to obtain extraordinary relief through injunction.[118]

In Utah, contract law is amoral.[119]  Parties are almost universally "free to contract according to their desires in whatever terms they can agree upon."[120]  The UCC also supports parties creating the boundaries and limits of their transactions; the UCC permits discarding almost all of the UCC framework and permits liability limitations.[121]  It would be antithetical to the freedom to contract if courts worked around the parties' bargained-for limitations to grant extraordinary relief in equity based on those same negotiated limitations.  The parties to the

---

[116] Phibro also mentions *Chambers v. Edmondson*, 594 F.3d 742 (10th Cir. 2010).  It does not govern in this situation.  Sophisticated parties limiting liability by contract is not the same as a complete bar to recovery based on sovereign immunity.

[117] *Bionpharma Inc. v. CoreRx, Inc.*, 582 F. Supp. 3d 167, 176 (S.D.N.Y. 2022).

[118] *Click Boarding LLC v. Smartrecruiters, Inc.*, No. 21-CV-210 (NEB/BRT), 2021 WL 1851944, at *5 (D. Minn. May 10, 2021).

[119] *TruGreen Companies, L.L.C. v. Mower Bros., Inc.*, 2008 UT 81, ¶ 19, 199 P.3d 929, 933.

[120] *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 35, 367 P.3d 994, 1003 (internal citation omitted).

[121] Utah Code Ann. § 70A-2-719; Utah Code Ann. § 70A-1a-302.

ARMSA included a limitation of liability provision deliberately.  The parties now will have the opportunity to argue about the full application of the liability limitation provision and ultimately obtain the full benefit of the bargain they entered.  As such, the presence of a limitation of liability provision does not, by itself, create irreparable harm.

4. Phibro has Insufficiently Demonstrated the Factual Circumstances of Going Out of Business.

The permanent shuttering of a business might support a finding of irreparable harm in some instances.  But a party raising this harm must make a sufficient evidentiary showing.  If a business is already worthless, there is no irreparable harm in it closing.[122]  It is not enough for a party to self-servingly conclude that its business or project may close.

Phibro vaguely argues that absent injunctive relief, it will be forced out of business.[123]  Phibro's offered declarations likewise offer vague conclusions including that "[o]perations in Utah will not survive."[124]  However, Phibro does not sufficiently detail the operations of its business to demonstrate irreparable harm.  There is no doubt that if Phibro is unable to obtain manure under the ARMSA, it will drastically impact its business.  The full extent of that impact, however, is unknown because Phibro has failed to make a sufficient evidentiary showing.

Since taking over the Biodigester Facility and rights under the ARMSA in 2019, Phibro has a cumulative net income loss of over $5 million dollars.[125]  In 2021 alone, EBITDA was a loss of more than a million dollars.[126]  For the entire period Phibro has owned the Biodigester

---

[122] *J.P.T. Auto., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 659 F. Supp. 2d 350, 355 (E.D.N.Y. 2009).

[123] Dkt. 75 at 20 (Reply).

[124] Dkt. 4 ¶ 21 (Greenshields Decl.).

[125] Dkt. 69-3 at 143 (Phibro Profit and Loss Statement, All Dates).

[126] *Id.*

Facility, Phibro has only generated a little over $700,000 in revenue.[127]  Phibro purchased the assets of BM Biogas, including its rights under the ARMSA, for $875,000.  This means that setting aside all expenses for nearly 4 years and setting aside all of the capital improvements Phibro has made in the nearly four years since taking over, Phibro has still failed to generate more revenue than the original purchase price.  Moreover, Phibro bought a failed business out of receivership and has yet to demonstrate productivity even equal to the failed business.[128]  This evidence raises serious questions about whether Phibro has any value and precludes a finding that Phibro will be irreparably harmed by going out of business.

Conversely, it is also not clear that Phibro will definitely go out of business.  Phibro argues that it is in the "relatively early stages of a long-term investment" and that "Phibro anticipated that it would operate at a loss for some time before it would begin to yield a profit."[129]  Despite all of the losses thus far, Phibro remains in business.  Phibro has produced no evidence demonstrating when it will be unable to continue to pay its debts.  Phibro did not point to its balance sheet to demonstrate its current financial condition or any evidence of its access to capital to continue operations.  Nor has Phibro pointed to evidence outlining the full scope of its business operations.  Phibro's reliance on assertions it will go out of business without pointing to supporting evidence is insufficient to meet its burden to show irreparable harm will occur without injunctive relief.

---

[127] *Id.*

[128] Dkt. 75-1 at 9 (August 4, 2021 Email from Simon Greenshields to Kraig Westerbeek noting that current Phibro production is 16MW compared to BM Biogas's production being around 30MW).

[129] Dkt. 72 at 22 (Reply).

5. <u>Phibro's Damages Can Reasonably Be Calculated.</u>

Phibro argues the time left in the stated term of the ARMSA and evolving nature of the renewables energy market make it difficult, if not impossible, to calculate damages.[130] This argument is not persuasive. The fixed length of time remaining under the ARMSA makes the calculation of future damages more feasible, not less.[131] Courts have also found that with enough data, periods of turbulence can be separated out and do not prevent damage calculations.[132] So too here. The court in unconvinced that Phibro's damages cannot be reasonably calculated given the limited future term and historical operational data. That Phibro has used historical performance to create forecasts through 2033[133] for purchase negotiations is evidence that damages can be reasonably calculated. Phibro cannot demonstrate irreparable harm based on the difficulty of calculating damages.

Looking at the totality of circumstances related to the relationship between Phibro and Murphy-Brown under the ARMSA, and in light of the evidence and arguments the parties present, the court finds Phibro has failed to carry its burden to show irreparable harm will occur without injunctive relief. This alone requires the court to deny Phibro's Motion.

---

[130] Dkt. 72 at 27 (Reply).

[131] *Mrs. Fields Franchising, LLC*, 941 F.3d at 1231 (Noting calculation of a permanent license would be nearly impossible, while years of historical data would permit calculating the future value of the remainder of a five-year term).

[132] *Id.* at 1236 ("Setting aside the period of the great recession and the period following the warehouse fire, that leaves a total of approximately eight years and three months' worth of sales data . . . Nothing in the record or in MFGPC's briefs persuades us that this data cannot serve as a reasonable measure of MFGPC's damages.").

[133] Dkt. 75-1 at 13 (12 Year Cash Flow Model Valuation Scenarios).

## II. THE BALANCE OF HARMS WEIGHS IN FAVOR OF DENYING THE INJUNCTION

Weighing the respective harms, Phibro has not made a strong showing that the threatened injury to Phibro outweighs the harm the preliminary injunction may cause Murphy-Brown. Before granting or withholding injunctive relief, "a court must balance the competing claims of injury and must consider the effect on each party . . . ."[134]  In weighing the respective harms, it is the irreparable harms of the movant that are weighed against the harms to the non-movant.[135] Because Phibro's requested relief is a mandatory injunction, Phibro must make a strong showing on this factor to obtain an injunction.[136]  But under either the heightened or default standard, Phibro is unable here to meet its burden to show that the balance of harms tilts in its favor.

Initially, the court rejects Phibro's argument that Murphy-Brown's actions in closing the BMS Farms finisher barns are a pretense to put a competitor out of business or otherwise constitute misconduct.[137]  Phibro recites no evidence to support this argument.[138]  The court also rejects Phibro's argument that Murphy-Brown's harms are self-inflicted and the type that should be excluded from a balancing analysis.[139]  As the Tenth Circuit explained in *Sierra Club, Inc. v. Bostick*, a finding of wrongful conduct is critical to a conclusion that harm is self-inflicted.[140]  In *Sierra Club*, the appellants argued that because TransCanada had entered into contracts to build a pipeline prior to Army Corps approval, the harms stemming from construction delays were self-

---

[134] *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987).

[135] *Fish v. Kobach*, 840 F.3d 710, 754 (10th Cir. 2016).

[136] *Mrs. Fields Franchising, LLC*, 941 F.3d at 1232.

[137] Dkt. 72 at 32 (Reply).

[138] This argument seems especially unfounded given the evidence before the court regarding Phibro's production, revenues, profits, and comparing the scale of the BMS Farms operation to Phibro's Biodigester Operations.

[139] Dkt. 72 at 31-32 (Reply).

[140] *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 894 (10th Cir. 2013).

inflicted.[141]  The *Sierra Club* Court rejected the harm as being self-inflicted because there was no wrongful conduct on the part of TransCanada.[142]  Phibro has presented no evidence that Murphy-Brown's conduct involved wrongful action or misconduct.

Phibro's alleged injury is potential loss of its investment in the biodigester business and what it believes will be significant future profits if Phibro is forced out of business.[143]  The court does not discount that without an injunction Phibro will be unable to operate the Phibro Biodigester Facility and that its business will be drastically altered.  However, as explained above, what that means is entirely unclear because Phibro has failed to present clear evidence the court can use to determine the value of that injury, if any.

For example, Phibro points to projections that it will make a minimum of $13 million in net income through the end of the term outlined in the ARMSA.[144]  But the $13 million net income projection does not appear to be a reliable figure for the court to evaluate.  That projection assumed an additional $1.7 million in capital investment and assumed that Phibro could operate at 30MW.[145]  During purchase negotiations, Phibro admitted it was only operating at 16MW, and Phibro has presented no evidence that it has invested the $1.7 million required for the projection.[146]  Moreover, Murphy-Brown expressed skepticism that significant production improvement could occur with the current system and only a $1.7 million dollar investment.[147]

---

[141] *Id.* at 890-92.

[142] *Id.* at 893-94.

[143] Dkt. 75 at 35-36 (Reply).

[144] *Id.* at 36-37.

[145] Dkt. 75-1 at 13 (12 Year Cash Flow Model Valuation Scenarios) (referencing the "Status QUO 30 MW Daily Production" model).

[146] *Id.* at 9 (email exchange between Simon Greenshields and Kraig Westerbeek discussing Phibro's production level and the $1.7 million capital investment in the projections).

[147] *Id.* at 9 (Kraig Westerbeek email to Simon Greenshields noting "I am not clear on how productivity is going to be increased substantially with the current system with $1.7M cap-ex.").

And the projection forecasted $4.04 million in revenues in 2022 with net income of $2.54 million.[148]  Phibro's evidence is nowhere near this projection—it admits it is still operating at a loss[149] and total revenue for the entire life of the project to date is only $700k.[150] Phibro has produced no evidence its projection is tied to the reality of its operation.  Additionally, the projection does not show exploding exponential revenues, it shows an increase in net income in 2022, and then stable, but decreasing net income through 2033.[151]

And as explained above, Phibro has produced no evidence of when or why it will be profitable in the future, nor has it produced evidence explaining how it is capitalized or how it continues to operate at a loss.  In essence, Phibro has failed to demonstrate it is not on the verge of putting itself out of business.  But it asks the court to simply trust that it will make millions of dollars.

Conversely, the harms Murphy-Brown faces are significant.  First, the loss of control over a business is a real and significant harm.  This court has previously noted the harms caused by losing "the right to control its business," the harm of being "forced into a business relationship for an extended period of time with [a] litigation rival" and how these types of harm prevent a company from "expanding or exploring other opportunities."[152]  The loss of business autonomy is a real harm regardless of the financial impact.

Additionally, an injunction would require Murphy-Brown to spend millions of dollars each month operating a part of its business determined not to be economically feasible as the

---

[148] Dkt. 75-1 at 13 (12 Year Cash Flow Model Valuation Scenarios) (referencing the "Status QUO 30 MW Daily Production" model).

[149] Dkt. 72-2 ¶ 7 (Greenshields Third Decl.) (Simon Greenshields admitting Phibro continues to operate at a loss).

[150] Dkt. 69-3 at 143 (Phibro Profit and Loss Statement, All Dates).

[151] Dkt. 75-1 at 13 (12 Year Cash Flow Model Valuation Scenarios) (emphasis added).

[152] *UHSpro, LLC*, 2017 WL 2729082 at *7.

Vernon Plant closes down.[153]  Although the historical profits Murphy-Brown has received from operating the BMS Farms substantially lessen the severity of this harm, an injunction would still force Murphy-Brown to operate a segment of its business it no longer wants to operate or believes is economically feasible to operate, employ hundreds of employees, and spend millions of dollars each month in expenses.  On balance, the harms to Murphy-Brown are more severe than the potential closure of Phibro's operation given that Phibro has provided no reliable evidence of financial viability.  This is especially true considering Phibro asks the court to force Murphy-Brown to operate at full-capacity levels when Phibro does not consistently come close to using all of the manure generated by Murphy-Browns operations at the ARMSA Finisher Barns.[154]  Phibro has not shown its harm outweighs the potential harm to Murphy-Brown, much less made a strong showing this factor weighs in its favor.  This failure alone requires the court to deny Phibro's Motion.

### III. LIKELIHOOD OF SUCCESS ON THE MERITS AND PUBLIC INTEREST

Having concluded that Phibro failed to establish the existence of irreparable harm or that the balance of harms weighs strongly in its favor, "it is unnecessary [] to address the remaining two requirements for the imposition of a preliminary injunction."[155]

### CONCLUSION

For the reasons explained above, the court concludes that Phibro has failed to carry its burden of demonstrating that a preliminary injunction is appropriate.  Accordingly, Phibro's Motion for Preliminary Injunction[156] is DENIED.

---

[153] Dkt. 26-1 ¶¶ 54-62 (Declaration of James W. Webb).

[154] Dkt. 26-1 ¶ 41 (Webb Decl.).

[155] *Mrs. Fields Franchising, LLC*, 941 F.3d at 1236.

[156] Dkt. 58 (Inj. Mot.).

SO ORDERED this 18th day of November 18, 2022.

BY THE COURT

Robert J. Shelby
United States Chief District Judge